# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| MATTHEW MATROS | : | |
| 51 Jay Street | : | |
| Brooklyn, NY 11201 | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No. _____ |
| v. | : | |
| | : | |
| QURATE RETAIL GROUP, INC., | : | |
| d/b/a QRG | : | **JURY TRIAL DEMANDED** |
| 1200 Wilson Drive | : | |
| West Chester, PA 19380 | : | |
| and | : | |
| QURATE RETAIL, INC., d/b/a QURATE | : | |
| 12300 Liberty Boulevard | : | |
| Englewood, CO 80112 | : | |
| and | : | |
| VCOMMERCE MANAGEMENT, LLC | : | |
| 1200 Wilson Drive | : | |
| West Chester, PA 19380 | : | |
| and | : | |
| QVC, INC., | : | |
| 1200 Wilson Drive | : | |
| West Chester, PA 19380 | : | |
| and | : | |
| QRG VCOMMERCE | : | |
| MANAGEMENT, LLC | : | |
| 1200 Wilson Drive | : | |
| West Chester, PA 19380 | : | |
| and | : | |
| ER DEVELOPMENT INTERNATIONAL, | : | |
| INC. | : | |
| 1200 Wilson Drive | : | |
| West Chester, PA 19380 | : | |
| and | : | |
| QURATE DIGITAL VENTURES, LLC | : | |
| 1200 Wilson Drive | : | |
| West Chester, PA 19380 | : | |
| | : | |
| Defendants. | : | |

_____:

## CIVIL ACTION COMPLAINT

Plaintiff, by and through his undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.      This action has been initiated by Matthew Matros (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) against Qurate Retail Group, Inc., Qurate Retail, Inc., vCommerce Management, LLC, QRG vCommerce Management, LLC, QVC, Inc, ER Developmental International, Inc., and Qurate Digital Ventures, LLC (*hereinafter* referred to collectively as "Defendants") for violations of the Americans with Disabilities Act ("ADA" - 42 USC §§ 12101 *et. seq.*), the Pennsylvania Wage Payment and Collection Law ("PWPCL" - 43 P.S. §§ 260.1 *et. seq.*), and for breach of Plaintiff's employment contract. The crux of this lawsuit is that Plaintiff was unlawfully (and in breach of his employment contract) terminated from his employment by Defendants. As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2.      This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a) (4) because it arises under a law of the United States and seeks redress for violations of a federal law. There lies supplemental jurisdiction over Plaintiff's state-law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein. There would alternatively be diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity, and Plaintiff is seeking in excess of §1332 jurisdictional thresholds (exclusive of costs and interest).

3.      This Court may properly maintain personal jurisdiction over Defendants because their contacts with this State and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying

the standard set forth by the United States Supreme Court in *International Shoe Co. v. Washington,* 326 U.S. 310 (1945) and its progeny.[1]

4.      Pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and Defendants are deemed to reside where they are subject to personal jurisdiction, rendering Defendants residents of the Eastern District of Pennsylvania.

## PARTIES

5.      The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

6.      Plaintiff is an adult individual, with an address as set forth in the caption. Plaintiff is a resident, domiciliary, and citizen of New York.

7.      Qurate Retail Group, Inc., d/b/a QRG (hereinafter, "Defendant QRG" where referred to individually) is a legal entity incorporated in the State of Delaware. Defendant QRG is an American media and retail conglomerate. Defendant QRG focuses on video commerce (a/k/a "vCommerce"), which includes video-driven shopping across linear TV, ecommerce sites, digital streaming, and social platforms. Defendant QRG is headquartered in West Chester, Pennsylvania at the above-captioned address.

8.      Qurate Retail, Inc., d/b/a Qurate (hereinafter, "Defendant QRI" where referred to individually) is a legal entity incorporated in the State of Delaware. Defendant QRI is a Fortune 500 company comprised of six primary retail brands (QVC, HSN, Ballard Designs, Frontgate,

---

[1] Within Plaintiff's Employment Agreement, Defendants themselves memorialized in a choice of venue <u>and</u> choice of law clause that Plaintiff <u>must</u> file his claims in Pennsylvania (specifying this Eastern District Court).

Garnet Hill, and Grandin Road), which "collectively" operate as Defendant QRG.[2] Defendant QRI is headquartered in Englewood, Colorado at the above-captioned address.

9.     Qurate Digital Ventures, LLC, d/b/a QRG Digital Ventures (hereinafter, "Defendant QDV" where referred to individually), Qurate vCommerce Management, LLC (hereinafter, "Defendant QVM" where referred to individually), and vCommerce Management LLC (hereinafter, "Defendant VM" where referred to individually) are all legal entities incorporated in the State of Delaware. These three (3) entities are collectively referred to as the "venture entities." The venture entities were established and incorporated in the State of Delaware on or about <u>January 24, 2022</u>.

10.     The venture entities were created by Defendants QRG and QRI (within less than one (1) month of Plaintiff's hire) to offer new products and services of their enterprise (with Plaintiff serving as an executive functionally overseeing operations of such venture entities). The venture entities were created with mailing locations in New York, but they were at all times *primarily* operated from the headquarters of Defendants QRG and QRI (and/or through management of Defendants QRG and QRI). The venture entities are self-described by Defendants QRG and QRI as "the digital arm of the Qurate Retail Group."[3]

11.     QVC, Inc. (hereinafter, "Defendant QVC" where referred to individually) is a subsidiary of Defendant QRG engaging in the business on online retail sales of consumer products. Defendant QVC is incorporated in the State of Delaware, and it is headquartered in West Chester,

---

[2] *See* https://www.qurateretail.com/about (Defendant QRI acknowledging publicly it operates "collectively" as Defendant QRG).

[3] This description and outline that the venture entities are merely "an arm" of Defendants QRG and QRI appear in "Qurate Digital Ventures" promotional materials provided to Plaintiff by Defendants QRG and QRI.

Pennsylvania at the above-captioned address. Defendant QVC is nothing more than a line of business of Defendant QRG, and Plaintiff regularly indirectly or directly interacted, coordinated, and was involved with operations (and management) of Defendant QVC.

12.     ER Developmental International, Inc. (hereinafter, "Defendant ERDI" where referred to individually) is a corporation established and incorporated in Pennsylvania. This entity is headquartered in West Chester, Pennsylvania, upon information and belief controlled by and through Defendant QVC, and is used as a mechanism or conduit to pay various high-level employees of all Defendants. Plaintiff was for example in part of his tenure paid directly by and through Defendant ERDI.

13.     All seven (7) Defendants in this lawsuit formed the same enterprise and treated various corporate names (and services) as if merely extensions (or arms) of the overall enterprise. Defendants utilized centralized management, overlapping resources, and functioned as an integrated business and operation. Defendants are properly considered single, joint and/or integrated employers of Plaintiff. More details of such joint employment are set forth in the Factual Background of this Complaint.

14.     At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## FACTUAL BACKGROUND

15.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

16.     Plaintiff was recruited, interviewed, and hired by high-level management of Defendants QRG and QRI (who oversee and operate all Defendants). By way of examples only,

Plaintiff was recruited for employment by David Rawlinson (President and CEO *of Defendant QRI*). Plaintiff was communicating with David Gerbitz (Chief People Officer *of Defendant QRG*) who offered Plaintiff employment by letter dated February 17, 2022.

17.     Plaintiff is a highly credentialed and accomplished professional. He has a Master of Business Administration ("MBA") from the University of Michigan and has matriculated through educational programs at the University of Southern California, Stanford University, and Harvard Kennedy School. Plaintiff has commenced, worked within, and operated numerous successful start-up ventures, including more recently selling Limitless Coffee, LLC (which he founded) to Keurig Dr. Pepper Inc. in January of 2020.

18.     Plaintiff was being heavily sought after by Defendants because the stock price of Defendants was down more than 95% in a five-year lookback, and Defendants needed an infusion of new ideas, new approaches, and demonstrated leadership from someone with a proven track record (in business entrepreneurship).

19.     "Effective February 28, 2022," Plaintiff entered into an "Employment Agreement" on Defendant QRG letterhead identifying Plaintiff was being employed as "Senior Vice President, **Head** of QRG Digital Ventures ["Defendant QDV"], reporting to Qurate Retail Group's ["Defendant QRG"] Executive Vice President." (Emphasis added).[4]

20.     In conjunction with Plaintiff's hiring, Plaintiff was informed he would also report to Rawlinson (who functionally oversaw operations of all Defendants in his role as CEO of

---

[4] In such a high-level capacity at the helm of a sizeable business earning a near 7-figure annual income package, Defendants would later abruptly (and allegedly) terminate Plaintiff (in his 13th month of employment) for not liking the manner in which he utilized nearly $11,000.00 in expenditures on behalf of Defendants (relative to equipment expenditures and YouTube channel cost(s)). Such an excuse lacks any credibility and seems entirely divorced from objective logic.

Defendant QRI). Plaintiff further reported to Mary Campbell (an Executive and Lead of Defendant of Defendant QRG) while in the employ of Defendants. Rawlinson and Campbell oversaw and/or coordinated operations of all Defendants.

21.     Plaintiff moved his family to New York from Illinois in conjunction with his hire and to be able to effectively perform his role for Defendants. Such a move was expected by and known to Defendants.

22.     During the course and scope of his employment, Plaintiff was supervised by and reported to executive management of Defendants QRG and QRI. Aspects of Plaintiff's compensation, including his "Long-Term Cash Incentive" and "equity incentive plan" were through Defendant QRI.[5]

23.     When Plaintiff was terminated from his employment (discussed *ad nauseum infra*), Plaintiff's termination from employment was confirmed in writing by Natalie Campion (Director of Defendant QRG), shortly after being verbally terminated by Linda Aiello (Chief People Officer of Defendant QRG). Plaintiff's offer of severance terms and payment(s) was by and through Aiello. And Plaintiff's severance agreement (proposed to him) asked him to waive all legal claims against "Qurate Retail, Inc., Qurate Retail Group, Inc., and other entities as an "employee."[6] For legal concerns in the severance agreement (or revocation), Plaintiff was (within the body of the

---

[5] Section 3(E) of Plaintiff's Employment Agreement states "[s]ubject to the approval of the Compensation Committee of Quarate Retail, Inc." . . . Plaintiff would be entitled to varying forms of restricted stock units and equity-based compensation (as further stated in the Agreement). Moreover, this was up-to a $4,000,000.00 bonus (depending upon performance).

[6] *See* Section 4 of Plaintiff's unsolicited and proposed severance agreement (titled: "Waiver and Release Agreement"). This document is not attached hereto as an exhibit and is referenced only as to content.

severance agreement) directed to communicate with Brian Crowner (counsel for Defendants QRG, QRI, and QVC).

24.     Defendants QRG and QRI operate as the same overall enterprise, and the venture entities are (and were) nothing more than additional intended services to be offered by Defendants QRG and QRI (as one of many arms of the same organization). As aforesaid, all Defendants are a single, joint, integrated and statutory employer for all purposes underlying this lawsuit.

25.     In accordance with the terms of Plaintiff's Employment Agreement, Plaintiff was employed for "one year" terms that "automatically renew each year" **unless** Plaintiff is afforded "at least ninety (90) days" of notice as to termination.

26.     According to the Employment Agreement, Plaintiff was entitled to base compensation, a bonus program, long-term cash incentives, an Attraction Award, restricted stock units, fringe benefits, and other compensation. Plaintiff reasonably anticipated earning a 7-figure annual income package in subsequent years of his employment (if not terminated wrongfully). Hence, Plaintiff's loss of employment has and will cause ***him a multi-million dollar loss*** in income and earnings (as to both past and future compensation combined, inclusive of benefits, equity, and other incentives).

27.     On or about February 17, 2023, Plaintiff participated in a meeting (the "February 17th meeting") with Defendants' senior management (such as Mary Campbell, President of Defendants' vCommerce Ventures in addition to other roles, and Rawlinson, CEO of Defendant QRI). Therein, Plaintiff informed Defendants' management (tearfully) that he was suffering from serious, diagnosed mental health issues and was obtaining treatment. Plaintiff explained that internal and external pressures were exacerbating his disabilities, and he wanted Defendants to be

aware that he was going through such health problems in the event he needed any time off from work or other medical accommodations.

28.     In particular, Plaintiff has and continues to suffer from depression, anxiety, and panic-related conditions. Plaintiff's health conditions are long term, but he was able to perform his role in an exemplary manner notwithstanding his disabilities. This summary is not intended to serve as an exhaustive list of Plaintiff's health complications, but just that, a short summary.

29.     During the aforesaid February 17th meeting, Defendants' management exhibited an intolerance towards Plaintiff's health, questioned if Plaintiff was able to work and/or perform his role, and did not affirmatively offer Plaintiff any accommodations whatsoever. Based upon the tone of the meeting, Plaintiff perceived concern by Defendants of his mental wherewithal and ability to lead Defendants' organization.

30.     On February 22, 2023 (only 5 days after the February 17th meeting), Plaintiff was contacted by Steve Carney (an IT Director of Defendant QRG). Carney stated via email (on February 22, 2022 at 4:07 PM) Defendants wanted to ensure proper connections, ensure proper security controls, and to perform updates on Plaintiff's work device(s). Under reality, Defendants lied to Plaintiff that anything they were doing (purportedly) *was routine* security; and instead, desired to rifle through Plaintiff's <u>entire</u> electronic work history to determine if there was any *feigned* basis to discipline or terminate Plaintiff.

31.     Plaintiff expressed concerns to Carney about his aggressive approach and why there was an immediate demand for his electronic information suddenly (after nearly a year of employment). By email dated February 22, 2023 (at 11:28 PM), Carney informed Plaintiff he was requested "by leadership" to "immediately" review Plaintiff's systems. Plaintiff was directed by Carney and his own management (Campbell) to immediately grant access to Defendants to G-

Suite, Slack, email(s), Plaintiff's work device(s) and other access(es) as requested. Plaintiff's business unit had been utilizing these tools – with the company's permission and knowledge – for several months prior to this request for control, review, and scrutiny.

32.     By email dated February 23, 2023, Plaintiff lodged a complaint with Campion (a Director of Human Resources for Defendants) that he felt attacked, was being treated like he was being terminated or arrested with a search of all of his electronic information and devices, and that the approach by Defendants was completely inappropriate in light of Plaintiff's known "fragile mental health situation." Plaintiff even sought a meeting with Campion, Aiello, and Campbell to discuss his health, accommodations, and concerns about mistreatment.

33.     On February 28, 2023, Plaintiff's Employment Agreement automatically renewed for a 1-year term because Defendants did not provide Plaintiff written (or verbal) notice of non-renewal. *This is demonstrative of Plaintiff performing his role very well.*

34.     Prior to March of 2023, Plaintiff had received ongoing praise from many levels of management through numerous entities for his accomplishments, business acumen, and progress of growth.

35.     On or about March 2, 2023, Plaintiff was summoned to a meeting whereby he was questioned for nearly an entire day by Defendants' legal counsel (2 of whom were in-house counsel and 1 of whom was outside counsel). Plaintiff was intensely questioned about issues in prior months of his employment, continuing the witch-hunt for any wrongdoing or mistakes by Plaintiff that commenced with a full review of his electronic work history (over a week earlier).

36.     From late February through early March of 2023, Plaintiff expressed concerns about his mistreatment, reiterated his health problems, and questioned whether there was a nexus

between his health discussions and how he was being mistreated (even questioning, as aforesaid, why he would be treated so harshly in light of his fragile mental health conditions).

37.     Plaintiff was given an annual performance appraisal dated March 9, 2023. Therein, Plaintiff's management stated *inter alia*: "Matt and the team have accomplished a lot in the past 9 months. They've done what others might have believed impossible" [and] "[t]he team is on the cusp of delivering a new experience for consumers and building a viable business model." Plaintiff was given an overall "successful" rating. Plaintiff's performance appraisal as of March 9, 2023 *is demonstrative of him performing his role very well.*

38.     Plaintiff was given *a merit-based* Base Compensation increase as of early March, 2023 (despite not being required in his Employment Agreement). *This is demonstrative of Plaintiff performing his role very well.*

39.     Defendants had no reason to not renew Plaintiff's entire Employment Agreement (in February of 2023) and were compelled to acknowledge Plaintiff's outstanding accomplishments and "successful" business achievements (as of early March of 2023).

40.     Nonetheless, Defendants (through higher-level management) were <u>*simultaneously*</u> engaging in a complete review of Plaintiff's entire work history to find <u>any</u> possible (and feigned) concern with his work performance, actions, or management. This is well known to be suggestive of discrimination or retaliation.[7]

---

[7] *See e.g. Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 350 (3d Cir. 2022)(reversing district court's dismissal of case and explaining the plaintiff was entitled to a jury trial because a "search" for wrongdoing is indicative of pretext or falsity as to termination rationale, <u>even if</u> wrongdoing is ultimately obtained by the employer. The court explained it is up to a jury to determine discriminatory or retaliatory intent when an employer searches for wrongdoing, even if obtained). *See also Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635, 644 (7th Cir. 2013)(reversing grant of summary judgment and explaining that circumstantial evidence including evidence of a "witch-hunt" creates an inference of retaliation sufficient to avoid summary judgment); *Gray v. City of Dothan*, 2015 WL 3849576, at *13 (M.D. Ala. 2015)(evidence of employer going on witch-hunt to find basis to terminate employee warranted denial of

41.     Plaintiff's and his team met (or exceeded) all expectations as of March 9, 2023 as to expected progress with Defendants' business. Plaintiff's team was awarded 100% of their bonuses. However, Plaintiff was only paid 80% of his bonus ($60,000.00 instead of $75,000.00). There was no justification for shorting Plaintiff of his full bonus, as: (a) his team received 100%; (b) he achieved the "impossible" per Defendants' own documented appraisal; and (c) he <u>earned</u> the full bonus. Plaintiff perceived this conduct to be discriminatory and retaliatory.

42.     Plaintiff questioned Campbell why 20% of his bonus was withheld, and she responded to Plaintiff - - due to "personal issues," that's all she could say. She refused to elaborate. Because Plaintiff rightly perceived his health disclosures to be the "personal issues," Plaintiff registered his concern that compensation should not be tied to his health – but rather – his performance. Plaintiff's bonus was not further adjusted (or paid in full).

43.     Through March 17, 2023, Plaintiff continued to discuss (with management including but not limited to Kelly Morgan, Vice President and People Lead) the depths of his mental health problems, need for treatment, and discussed a variety of potential health accommodations.

44.     On or about March 24, 2023, Plaintiff was required to participate in a videoconference with Aiello. Therein, he was informed he was being terminated effective immediately, "for cause" (according to Defendants). This is <u>despite that</u> Defendants had the <u>same</u> information about the alleged "cause" reasons for Plaintiff's termination for at least one (1) month, yet nothing was so serious as to warrant any immediate removal or termination.[8]

---

summary judgment); *Welch v. Eli Lilly & Co.*, 2013 WL 4413323, at *20 (S.D. Ind. 2013)(evidence of employer looking for reason to terminate the plaintiff supported retaliation claim sufficient to avoid summary judgment).

[8] In fact, Defendants approved such expenses in or about November of 2022 and knew of the very same expenses for <u>nearly 4 months</u> preceding Plaintiff's termination from employment. But in the event Defendants assert more specific

45.     Between the short termination discussion and correspondence that ensued (post-termination), Plaintiff learned that Defendants were claiming there were three (3) reasons for his termination (purportedly, "for cause"). Such reasons are addressed seriatim:

(1)  Defendants claimed Plaintiff was terminated because $4,500 in equipment was sold to Defendants from an entity in which Plaintiff had a legal and equity interest. Defendants claimed this violated Defendants' "Code of Conduct" policy. **Plaintiff anticipated earning an approximate 7-figure compensation package from Defendants, did not care about generating any profit from helping Defendant with equipment sales, and at all times believed he had the discretion to engage in sales, contracts and purchases (as he agreed to much more material transactions than such a nominal deals). <u>In context</u>, terminating Plaintiff for some vendor sales about or concerning products <u>fully received</u> by Defendants is blanketly absurd.**

(2)  Defendants claimed Plaintiff was terminated because he submitted a purchase order for services to be performed by a company named FlackCo Productions ("FlackCo"). Defendant claims Plaintiff should not have submitted a purchase order because this company is owned in part or whole by Mike Flack (or his wife), who works for Defendants. Defendants claim this violates their "Code of Conduct" policy. **Plaintiff merely submitted purchase orders for services, equipment or products that are needed and/or to elevate the companies. Defendants chose to decline the purchase order as to FlackCo, and <u>no sale or fees</u> were paid by Defendants. Plaintiff believed he had the discretion to submit purchase orders for necessary services, equipment or products. Plaintiff had in fact informed management about ownership of the FlackCo in the past, and in a clear example of targeting him Mike Flack was not terminated for any alleged or feigned impropriety.**

(3)  Defendants claimed Plaintiff, without proper authority, used company funds totaling $6,500.00 for the purchase of 1 or 2 YouTube Channels. Defendants claimed this violated Defendant's "Code of Conduct" policy. **Plaintiff was authorized to make such expenditures, and he was the "Head" executive overseeing the venture entities.**

---

knowledge or pivot in their defenses in some fashion, this matter was so non-concerning and trivial in value that even following meeting with counsel, Plaintiff remained employed for at least one (1) month.

## A CLOSER FOCUS UPON PLAINTIFF'S
## <u>BREACH OF CONTRACT ALLEGATIONS & SPECIFIC DAMAGES</u>

46.     If Plaintiff was terminated by Defendants <u>without</u> "cause," Plaintiff was contractually entitled to receive his "then-current Base Compensation" for "a period of eighteen (18) months (Severance Benefits)." This was contractually guaranteed to Plaintiff in Section 9(C) of his Employment Agreement. These Severance Benefits total $<u>463,000.00</u>.

47.     Plaintiff was not paid $463,000.00 at time of termination because Defendants claimed (and feigned) his termination was for "cause."

48.     Pursuant to Plaintiff's Employment Agreement, a termination for cause is <u>exceptionally narrow</u>. In particular, "cause" is defined as: (i) "the commission of a material breach of this Employment Agreement;" (ii) "the commission of fraud or embezzlement or other serious misconduct . . .;" (iii) "the conviction of a felony;" and (iv) "the conviction of a misdemeanor which conviction relates to [Plaintiff's] suitability for employment in [his] then current position."

49.     Plaintiff asserts herein that: (1) no actions or omissions by him rise to the level of "cause," as defined by his Employment Agreement; (2) Plaintiff did not engage in any misconduct or wrongdoing; and (3) even if hypothetically Plaintiff were to have violated any policy <u>or preference</u> for more communication(s), no alleged or feigned breach of contract by Plaintiff was sufficient to vitiate Defendant's obligation to pay him $463,000.00. Stated conversely, Plaintiff did not engage in any "material" breach of his Employment Agreement sufficient to invalidate his entitlements (even if Defendants developed an inclination to terminate him for their own "personal" reasons).

50.     Plaintiff is entitled to $463,000.00 in severance compensation, plus costs and interest for his breach of contract claim. This is entirely separate from all statutory damages available under the ADA and PWPCL (discussed *infra*).

14

51.     Moreover, as outlined below, Defendants offered Plaintiff $150,000.00 in unsolicited severance if he waived all legal claims. This contradicts that Plaintiff was actually terminated for cause; and instead, wholly demonstrates that Defendants attempted to pay Plaintiff less than he was entitled by contract. Moreover, as set forth *infra*, this leveraged severance offer conditioned upon a waiver of legal claims is absolutely admissible evidence.

**A CLOSER FOCUS UPON PLAINTIFF'S**
**CLAIMS UNLAWFUL TERMINATION AND PRETEXT**

52.     As of early March 2023, Plaintiff was in every respect viewed as someone who performed exceptionally well as a leading executive for Defendants' venture entities. It defies logic (as well as Defendants' feigned defenses) that Plaintiff suddenly began misbehaving in such an extreme manner so as to justify his immediate termination.

53.     Within roughly a week of disclosing mental health problems and discussing potential accommodations, Plaintiff was subjected to a full forensic review and investigation of his email, messaging, social platforms, work devices, and other communications. In short, Defendants engaged in a witch-hunt to find any rationale within which to justify Plaintiff's (anticipated pretextual) termination from employment.

54.     During Plaintiff's last approximate month of employment, he relayed his health concerns and concerns of mistreatment on account of his health on several occasions. Plaintiff was terminated pretextually in very close temporal proximity to such medical disclosures and concerns he lodged.

55.     Plaintiff, <u>earning a near 7-figure annual compensation package</u>, was terminated for Defendants' (purported) concerns Plaintiff was not communicative enough about expenses he made totaling $11,000.00 for equipment (fully received by Defendants) and a YouTube channel purchase (for Defendants) and having a Purchase Order for future expenses for FlackCo denied

(despite that Plaintiff was a high-level executive, the head of the venture, had significant discretion, and engaged in many expenditures for Defendants). No reasonable factfinder would believe this rationale for Plaintiff's termination even aside from the witch-hunt within which Defendants engaged to find these reasons to support Plaintiff's termination from employment.

56.     Plaintiff was terminated by Defendants with no meaningful opportunity to discuss or respond to allegations that allegedly formed the basis of his termination from employment (as he was not given detailed information when questioned by counsel of Defendants roughly a month prior to his termination from employment).

57.     When Plaintiff was terminated, he was contemporaneously offered an unsolicited severance package (titled "Waiver and Release") of $150,000.00 representing 6 months of Base Compensation if he agreed to waive his discrimination and retaliation claims (despite purportedly being terminated for "cause"). This isn't something a business does when an employee supposedly engages in misconduct, fraud, or wrongdoing. In fact, this is well-established admissible evidence of discrimination, retaliation and pretext.[9] Defendants on the one hand claimed Plaintiff's reasons for termination were so serious as to constitute misconduct, abuse or fraud, yet Defendants offered

---

[9] *See Staffieri v. Northwestern Human Servs.*, 2013 U.S. Dist. LEXIS 72115 at **14-15 (E.D. Pa. 2013)(an employer who offered severance at the time of termination when policies did not require upon condition of waiving claim supported finding of pretext among other facts); *Bartlett v. NIBCO Inc.,* 2011 U.S. Dist. LEXIS 28072 (N.D. Ind. 2011)(finding that a severance agreement offered contemporaneously to when the employee was terminated was "probative on the issue of whether NIBCO's motive for terminating Bartlett was [false]."); *EEOC v. Republic Servs., Inc.,* 640 F. Supp. 2d 1267 (D. Nev. 2009)(denying summary judgment and considering as evidence in wrongful termination case that a company would offer severance when an employee is supposedly terminated in a manner that doesn't warrant severance per an explicit company policy); *Karl v. City of Mountlake Terrace*, 2011 U.S. Dist. LEXIS 59085 (W.D. Wash. 2011)(severance agreements are admissible in retaliation claims when made contemporaneous to termination, as they are not governed by Fed.R.Evid. 408); *Brandy v. Maxim Healthcare Servs., Inc.,* 2012 WL 5268365, at *2 (N.D. Ind. 2012)(holding that severance agreements offered at the time of termination do not fall under Rule 408 because they are offered before a dispute arises, regardless if the employer "anticipated the severance agreement curtailing any potential future litigation.").

Plaintiff $150,000.00 contradicting any real belief(s) Plaintiff did anything wrong, serious or in violation of his contractual obligations.

58.     As a result of his termination from employment for ADA-protected activities, Plaintiff is owed **millions of dollars** in back pay, front pay, benefits, stock entitlements, relocation, medical expenses, emotional distress, punitive damages, attorney's fees, and other statutorily available damages.

### A CLOSER FOCUS UPON PLAINTIFF'S<br>STATUTORY WAGE VIOLATION CLAIM

59.     Defendants did not pay Plaintiff $15,000.00 of earned bonus income or $463,000.00 in severance compensation that was contractually owed to Plaintiff immediately upon termination.

60.     "Wages" governed by the Pennsylvania Wage Payment & Collection Law ("PWPCL") includes "fringe benefits or wage supplements." *See* 43 P.S. § 260.2a. "Fringe Benefits or Wage Supplements" "include all monetary employer payments to provide benefits under **any employee benefit plan**," . . . "**as well as a separation" pay**. *Id.* (Emphasis added).

61.     Plaintiff's severance and separation pay is a "wage" as defined under the PWPCL. *See e.g. Tisa v. Beasley FM Acquisition Corp*, 343 F. App'x 793, 795 (3d Cir. 2009)(affirming jury verdict in favor of plaintiff for breach of contract <u>and</u> PWPCL when employer tried to pretextually claim "insubordination" as "cause" to avoid severance while offering substantially less severance than the contract otherwise entitled - - a case very similar to Plaintiff's scenario herein); *Shaer v. Orthopaedic Surgeons of Cent. Pa., LTD.,* 2007 PA Super 371 (Pa. Sup. Ct. 2007)(reversing lower court and explaining "severance" is governed by the WPCPL).

62.     Defendants' attempt to only offer partial severance and not the full severance compensation warrants a verdict against Defendants, as they pretextually denied Plaintiff <u>all</u>

compensation owed as of termination (by way of "Severance"). Under the PWCPL, Plaintiff is entitled to:

(1) $15,000.00 in unpaid bonus income (a "wage"), as defined by the PWPCL;

(2) $463,000.00 in unpaid "wages" or "benefits," as defined by the PWPCL;

(3) $119,500.00 in mandatory (additional) liquidated damages, as dictated by the PWPCL. *Id*. at § 260.10; and

(4) To file a full fee petition for all legal fees associated with seeking, collecting and litigating for wages governed by the PWPCL.[10]

63.     Plaintiff anticipates seeking and obtaining total damages well in excess of $600,000.00 for unpaid wages under PWPCL (inclusive of legal fees). This is *separate and apart* from backpay, front pay, benefits, options, awards, emotional distress, punitive damages, and attorney's fees associated with his ADA statutory claim(s).

**COUNT I**
**Violations of the Americans with Disabilities Act ("ADA")**
**(Discrimination and Retaliation)**
**- Against All Defendants -**

64.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

65.     Plaintiff was denied his full 2023 bonus and terminated because of his actual or perceived health problems and/or in retaliation for seeking workplace accommodations and/his complaints of mistreatment on account of health needs / disclosures.

---

[10] *See* 43 Pa. Stat. Ann. § 260.9f ("The court in any action brought under this section **shall**, in addition to any judgment awarded to the plaintiff or plaintiffs, allow costs for reasonable attorneys' fees of any nature to be paid by the defendant.")

66.     Plaintiff has and will continue to lose millions of dollars in backpay, front pay, stock options, benefits, and other awards and incentives. Plaintiff seeks a multi-million-dollar verdict for these damages, as well as for emotional distress, punitive damages, and attorney's fees.

67.     These actions aforesaid constitute violations of the ADA, as amended.

68.     Plaintiff properly exhausted his administrative remedies by timely filing a Charge with the Equal Employment Opportunity Commission ("EEOC") and by filing this lawsuit within ninety (90) days of receiving a right-to-sue letter and/or notice of case closure.

**COUNT II**
**Breach of Contract**
**- Against All Defendants -**

69.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

70.     Plaintiff had an employment contract with Defendants, as there was an offer, consideration, and acceptance. As outlined *supra*, it contained memorialized terms of compensation and severance benefits.

71.     Defendants terminated Plaintiff without cause, but failed to pay Plaintiff $463,000.00 in unpaid compensation owed by way of "severance." Defendants exaggerated a rationale to terminate Plaintiff to avoid full contractual obligations.

72.     Defendants' actions of breach of contract directly and proximately caused Plaintiff a financial loss (and contractual entitlement) of $463,000.00, plus other legal and equitable damages for breach of contract.

**Count III**
**Violations of the Pennsylvania Wage Payment & Collection Law ("PWPCL")**
**(Unpaid Wages)**
**- Against All Defendants -**

73.     The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

74.     Plaintiff was not paid full bonus income, or all employment plan and separation pay contractually assured him upon separation from employment.

75.     As a result, Plaintiff is entitled to owed wages, liquidated damages, attorney's fees, and other legal or equitable remedies.

76.     These actions as aforesaid constitute violations of the PWPCL.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.     Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay, benefits, equity, options, incentives, bonuses, other forms of tangible or intangible compensation Plaintiff would have received had it not been for Defendants' illegal (and breach of contract) actions, including but not limited to back pay, front pay, salary, pay increases, equity, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

B.     Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

C.     Plaintiff is to be awarded liquidated damages, as permitted by applicable law;

D.     Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering);

E.       Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

F.       Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By:       _____
Ari R. Karpf, Esq.
Christine E. Burke, Esq.
3331 Street Road
Two Greenwood Square, Suite 128
Bensalem, PA 19020
(215) 639-0801

Dated: August 7, 2023

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

<u>**CASE MANAGEMENT TRACK DESIGNATION FORM**</u>

|  |  |  |  |
|---|---|---|---|
| Matthew Matros | : | CIVIL ACTION | |
| v. | : | | |
| | : | NO. | |
| Qurate Retail Group, Inc., d/b/a QRG, et al. | : | | |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                  ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
     and Human Services denying plaintiff Social Security Benefits.                                ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
     exposure to asbestos.                                                                                           ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
     commonly referred to as complex and that need special or intense management by
     the court. (See reverse side of this form for a detailed explanation of special
     management cases.)                                                                                              ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (X )

| | | |
|---|---|---|
| 8/7/2023 | | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (215) 639-0801 | (215) 639-4970 | akarpf@karpf-law.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### DESIGNATION FORM

*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _51 Jay Street, Brooklyn, NY 11201_

Address of Defendant: _1200 Wilson Drive, West Chester, PA 19380; 12300 Liberty Blvd., Englewood, CO 80112_

Place of Accident, Incident or Transaction: _Defendants place of business_

---

**RELATED CASE, IF ANY:**

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☒

I certify that, to my knowledge, the within case ☐ is / ☒ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _8/7/2023_  _____  _ARK2484 / 91538_
　　　　　　　　　　*Attorney-at-Law / Pro Se Plaintiff*　　　*Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.**　**Federal Question Cases:**

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☒ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☐ 11. All other Federal Question Cases
  *(Please specify):* _____

**B.**　**Diversity Jurisdiction Cases:**

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

### ARBITRATION CERTIFICATION

*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _Ari R. Karpf_ , counsel of record *or* pro se plaintiff, do hereby certify:

☒　Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs:

☐　Relief other than monetary damages is sought.

DATE: _8/7/2023_  _____  _ARK2484 / 91538_
　　　　　　　　　　*Attorney-at-Law / Pro Se Plaintiff*　　　*Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

Civ. 609 (5/2018)

JS 44   (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

MATROS, MATTHEW

**(b)** County of Residence of First Listed Plaintiff  Kings
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Karpf, Karpf & Cerutti, P.C.; 3331 Street Road, Two Greenwood Square, Suite 128, Bensalem, PA 19020; (215) 639-0801; akarpf@karpf-law.com

## DEFENDANTS

QURATE RETAIL GROUP, INC., D/B/A QRG, ET AL.

County of Residence of First Listed Defendant  Chester
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| 1  U.S. Government Plaintiff | X 3  Federal Question *(U.S. Government Not a Party)* |
| 2  U.S. Government Defendant | 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance<br>120 Marine<br>130 Miller Act<br>140 Negotiable Instrument<br>150 Recovery of Overpayment & Enforcement of Judgment<br>151 Medicare Act<br>152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>153 Recovery of Overpayment of Veteran's Benefits<br>160 Stockholders' Suits<br>190 Other Contract<br>195 Contract Product Liability<br>196 Franchise | **PERSONAL INJURY**<br>310 Airplane<br>315 Airplane Product Liability<br>320 Assault, Libel & Slander<br>330 Federal Employers' Liability<br>340 Marine<br>345 Marine Product Liability<br>350 Motor Vehicle<br>355 Motor Vehicle Product Liability<br>360 Other Personal Injury<br>362 Personal Injury - Medical Malpractice | **PERSONAL INJURY**<br>365 Personal Injury - Product Liability<br>367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>370 Other Fraud<br>371 Truth in Lending<br>380 Other Personal Property Damage<br>385 Property Damage Product Liability | 625 Drug Related Seizure of Property 21 USC 881<br>690 Other | 422 Appeal 28 USC 158<br>423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>820 Copyrights<br>830 Patent<br>835 Patent - Abbreviated New Drug Application<br>840 Trademark | 375 False Claims Act<br>376 Qui Tam (31 USC 3729(a))<br>400 State Reapportionment<br>410 Antitrust<br>430 Banks and Banking<br>450 Commerce<br>460 Deportation<br>470 Racketeer Influenced and Corrupt Organizations<br>480 Consumer Credit<br>490 Cable/Sat TV<br>850 Securities/Commodities/ Exchange<br>890 Other Statutory Actions<br>891 Agricultural Acts<br>893 Environmental Matters<br>895 Freedom of Information Act<br>896 Arbitration<br>899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>950 Constitutionality of State Statutes |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | |
| 210 Land Condemnation<br>220 Foreclosure<br>230 Rent Lease & Ejectment<br>240 Torts to Land<br>245 Tort Product Liability<br>290 All Other Real Property | 440 Other Civil Rights<br>441 Voting<br>442 Employment<br>443 Housing/ Accommodations<br>X 445 Amer. w/Disabilities - Employment<br>446 Amer. w/Disabilities - Other<br>448 Education | **Habeas Corpus:**<br>463 Alien Detainee<br>510 Motions to Vacate Sentence<br>530 General<br>535 Death Penalty<br>**Other:**<br>540 Mandamus & Other<br>550 Civil Rights<br>555 Prison Condition<br>560 Civil Detainee - Conditions of Confinement | 710 Fair Labor Standards Act<br>720 Labor/Management Relations<br>740 Railway Labor Act<br>751 Family and Medical Leave Act<br>790 Other Labor Litigation<br>791 Employee Retirement Income Security Act | 861 HIA (1395ff)<br>862 Black Lung (923)<br>863 DIWC/DIWW (405(g))<br>864 SSID Title XVI<br>865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>870 Taxes (U.S. Plaintiff or Defendant)<br>871 IRS—Third Party 26 USC 7609 | |
| | | | **IMMIGRATION**<br>462 Naturalization Application<br>465 Other Immigration Actions | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| X 1 Original Proceeding | 2 Removed from State Court | 3 Remanded from Appellate Court | 4 Reinstated or Reopened | 5 Transferred from Another District *(specify)* | 6 Multidistrict Litigation - Transfer | 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
ADA (42USC12101)

Brief description of cause:
Violations of the ADA, PWPCL and for breach of Plaintiff's employment contract.

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   X Yes    No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE  8/7/2023

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

| Print | Save As... | Reset |